NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SHEA G., TIFFANI D., AARON D., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.G., S.G., E.D., *Appellees.*

No. 1 CA-JV 19-0337
FILED 9-29-2020

Appeal from the Superior Court in Maricopa County
No.  JD36277
JS19773
The Honorable Pamela Hearn Svoboda, Judge

**AFFIRMED**

COUNSEL

Law Office of H. Clark Jones, Mesa
By H. Clark Jones
*Counsel for Appellant Shea G.*

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Aaron D.*

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant Tiffani D.*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Cynthia J. Bailey joined.

---

**H O W E**, Judge:

¶1        Shea G. ("Father G."), Aaron D. ("Father D."), and Tiffani D. ("Mother") appeal the juvenile court's order terminating their parental rights to E.D., M.G., and S.G. and the court's order finding the children dependent.[1] For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Father G. and Mother met in New Mexico in 2010, married in 2012, and had two children together, M.G., born in March 2011, and S.G., born in December 2012. They divorced in 2014, and shared joint custody of the children. Father G. was arrested in 2014 for failing to pay child support and his paycheck was subsequently garnished for child support. After that, Father G. visited the children inconsistently and missed more of his parenting time than he exercised. And after March 2015, he stopped seeing the children altogether. He tried calling Mother "several times a week for a couple weeks" in March 2015 before stopping. Because his calls went straight to voicemail, he assumed Mother had blocked him on her phone. She also blocked him on one of her social media accounts.

¶3        In May 2015, the New Mexico family court ordered that the parties communicate using Family Wizard, a $100 communication application. Father G. never purchased the application, stating that he could not afford it. He did not ask any family members or friends for money to

---

[1]        Because the critical issue is whether reasonable evidence supported the juvenile court's order terminating Father G.'s, Father D.'s, and Mother's parental rights, their arguments challenging the court's dependency findings are moot. *See Rita J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 512, 515 ¶ 10 (App. 2000) (noting that after a severance has been entered, an appeal from a dependency finding is moot).

help pay for the application. He also knew where Mother attended church in New Mexico and never contacted her there. He did not call the police to report that Mother was violating their parenting plan. And he never notified the family court that he was not seeing his children, claiming that he could not afford the filing fees. He also never attempted to have the fees waived. He also did not send his children any gifts, cards, or letters in 2016 or 2017.

¶4            Meanwhile, Mother met Father D. in October or November 2014 while living in New Mexico, married him in April 2015, and moved with him to Arizona in February 2017. Mother and Father D. had one child together, E.D., born in December 2015. Father G. later moved to Arizona in March 2017. He worked at a grocery store and made $1,200 a month after taxes and child support. He lived with his parents for a period, paid no rent, and had no other expenses. He still did not attempt to purchase the Family Wizard application, nor did he attempt to contact the New Mexico family court to see his children.

¶5            Mother enrolled E.D. at a daycare. She dropped E.D. off at daycare on August 6, 2018, where she was placed in the two-year-old's room. The daycare employees assigned to that room took the children to the bathroom or checked their diapers every hour, keeping a detailed bathroom log. E.D. had no injuries or bleeding while she was at the daycare that day. Father D. picked up E.D. from daycare at 6:00 p.m., took her to M.G. and S.G.'s school for meet-the-teacher night, took her to pick up food, and then took her home. E.D. was exclusively in Father D.'s and Mother's care after she left the daycare.

¶6            On August 7, 2018, at 7:00 a.m. Mother dropped off E.D. at daycare. Emily Peshlakai was one of two teachers supervising the children in the two-year-old's room. Around 8:00 a.m., Peshlakai took E.D. to the bathroom. E.D. did not have to go, so she resumed playing with the other children.

¶7            At 9:00 a.m., when Peshlakai started changing E.D.'s diaper, she noticed that E.D. was bleeding from her vaginal area. The assistant director and director went to the changing table and saw blood clots coming from E.D.'s vagina. While Peshlakai finished changing E.D.'s diaper, the daycare director called E.D.'s parents who sent E.D.'s maternal grandmother, Stephanie Swan, to pick her up. Swan initially took E.D. to a nearby hospital and Father D. met her there. The hospital recommended that E.D. be taken to a children's hospital, so Father D. drove her to the children's hospital and Mother met them there.

¶8          When Father D., Mother, and E.D. arrived at the children's hospital, the emergency room doctor determined that E.D. had a one-half to one centimeter long injury to her vagina. A family nurse practitioner, Haley Dietzman, asked Mother for consent to forensically examine E.D., and Mother agreed only after asking what would happen if she did not consent and if she needed a lawyer. Dietzman examined E.D. under anesthesia and found that she had a three centimeter laceration that extended inside her vagina and required about 30 stitches to repair. When Dr. Lisa McMahon, the pediatric surgeon who repaired E.D.'s injury, told Mother the extent of E.D.'s injury, Mother's initial response was "I'm going to jail."

¶9          The Phoenix Police Department and the Department of Child Safety ("DCS") investigated E.D.'s injury. DCS initially allowed the children to continue living with Father D. and Mother. A safety plan was put in place that required the children to be supervised by a safety monitor when they were home with Father D. and Mother. Father D. and Mother recommended, and DCS approved, Swan and Pascal Nemmar, the children's Godfather, as two of the safety monitors in August 2018.

¶10          In mid-August, Phoenix police obtained a search warrant for Father D. and Mother's house. When the search warrant was executed, Nemmar was the only person at the house. Police obtained several blood samples found in the house, including from a blood stain found on E.D.'s bedsheet.

¶11          About a week later, DCS petitioned for dependency of all three children and they were removed from Father D. and Mother's house and placed with Swan. Days later, the children were removed from Swan's house, placed in a foster home, and eventually placed with their paternal grandmother in December 2018. DCS also separately petitioned to terminate Father G.'s, Father D.'s, and Mother's parental rights to the children in October 2018, alleging abandonment, abuse, and failure to protect.

¶12          DCS offered Father D. and Mother supervised visitation, therapeutic visitation, psychological evaluations, and counseling services. Mother participated in supervised visitation but refused to participate in the other services. Mother participated in counseling on her own but mainly focused on her anger toward DCS rather than the trauma her children had suffered.

¶13        The New Mexico Police Department contacted Phoenix police in November 2018, because they received a tip about Nemmar in relation to Father D. and Mother's house. Thereafter, Nemmar was arrested in December 2018 for sexual exploitation of a minor. He had taken nude photos of E.D. and M.G. at his house in New Mexico and at Father D. and Mother's house in Arizona and some of the pictures showed that Nemmar had engaged in sexual conduct with M.G. Some of the photos were uploaded online using the internet at Father D. and Mother's house on the same day that police executed the search warrant.

¶14        The juvenile court held a 15-day combined dependency and termination hearing between April 2019 and August 2019. Peshlakai testified that she did not hurt E.D. when she was changing her diaper, nor did she attempt to clean inside E.D.'s vagina. Multiple daycare employees testified that Peshlakai was wearing latex gloves when changing E.D.'s diaper, that she did not have long or sharp fingernails, and that they did not see blood on her gloves.

¶15        Dietzman testified that, while the emergency room doctor indicated that E.D.'s injury was between one-half to one centimeter in length, he did not observe E.D. under anesthesia and did not see that the injury extended into her vagina. She testified that the injury was caused within the previous 48 hours by non-accidental blunt force sexual assault. She further testified that because E.D. was changed every hour at the daycare on August 6, 2018, and did not bleed while being wiped, the injury occurred sometime after 6:00 p.m. that day but before 9:00 a.m. on August 7, 2018. She also testified that if the injury had occurred while E.D. was on the changing table, daycare employees would not have seen blood clots. She indicated that E.D. would have been in significant pain when the injury happened and that her caregivers would have known something was wrong. She testified lastly that Mother did not bring E.D. to her first follow-up appointment after the surgery and she opined that if E.D. or any of the children were returned to the environment where E.D. was injured, they would be at an imminent risk of abuse or neglect.

¶16        Dr. McMahon also testified that if blood clots were seen, then the injury would not have occurred at that time. She further testified that E.D.'s injury was non-accidental because the injury occurred directly to her vagina and "had to have had some sort of force to it." She testified that the injury was deep, moderately severe, and "could not have happened from a diaper change." She testified that E.D. would have likely screamed out in pain when the injury happened.

¶17    Father D. retained Dr. C. Paul Sinkhorn, an obstetrician gynecologist surgeon, as an expert witness. He testified that E.D.'s injury occurred between four and twelve hours from the time Dietzman conducted the forensic examination. He testified that if her injury was one-half to one centimeter long when she was brought to the emergency room, her injury could have extended to three centimeters because she was examined multiple times. He opined that E.D.'s injury was accidental and could have been caused by cleaning her if she already had a small tear. He testified that, in his experience, the most common cause of vaginal tearing was an accidental cut from a fingernail. But Mother was the only person who had long fingernails and who also had contact with E.D. when she was injured.

¶18    During cross-examination, Dr. Sinkhorn admitted that a fingernail would not typically break the skin of a child without also breaking through the latex glove. He admitted that he does not specialize in child sexual abuse and that none of the cases he has testified about in the last four years were related to child sexual abuse. He testified that since he completed his residency in 1982, he has not "seen very many children with injuries" and that the last case he was involved in that dealt with child sexual abuse was between six and eight years earlier.

¶19    Mother testified that Swan came over to her house on August 6, 2018, and left a few hours after the children went to bed. She further testified that nothing unusual occurred that night and that none of the children screamed or cried. She also testified that E.D. was not in any distress and was not bleeding on the morning of August 7, 2018. She testified that she believed Peshlakai injured E.D. at the daycare. Father D. also believed that Peshlakai "shoved her finger or an object up inside of [E.D.] and hurt her" at the daycare.

¶20    Swan testified that on August 6, 2018, she met Father D. and Mother at meet-the-teacher night and then went to their house for dinner, leaving at 9:30 p.m., after the children had went to bed. But when the police and the Office of Child Welfare Investigations interviewed Swan, she told both that she did not see E.D. and did not go to Father D. and Mother's house on August 6, 2018.

¶21    Father D. retained Mary Oakley, a psychologist to provide a bonding assessment between him, Mother, and the children and a best interests analysis. She testified that Father D. and Mother had "positive, secure attachments with all three of the children" and that it could be harmful to separate the children from their parents because separation can

result in emotional and behavioral problems and, in some cases, cognitive problems. She admitted that she only observed Father D. and Mother interacting with the children for 45 minutes and did not observe them interacting with the children individually. She admitted that her opinion might differ if either parent had abused or failed to protect the children.

¶22 DCS's case manager testified that the paternal grandmother, the children's current placement, was meeting the children's needs and that all three children were adoptable. She also testified that Mother violated visitation guidelines by passing messages in a notebook to the children and tearing out the notes when asked for them. The children also disclosed that Father D. and Mother paid them not to tell the case manager everything. The paternal grandmother testified that she was willing to adopt all three children. She also stated that Father D. and Mother had told the children that she was mean.

¶23 After the hearing, the juvenile court adjudicated all three children dependent. The court then terminated Father G.'s parental rights based on abandonment under A.R.S. § 8–533(B)(1). The court found that Father G. had abandoned his children for over three years and that but for DCS's involvement, he would not have reentered his children's lives.

¶24 The court also terminated Father D.'s parental rights to E.D. and Mother's parental rights to all three children based on abuse or neglect under A.R.S. § 8–533(B)(2). The court found that E.D. could not have been injured at the daycare and that no evidence suggested that Peshlakai had anything sharp enough to cause the laceration to E.D. The court therefore concluded that "the only plausible explanation for [E.D.'s] injuries is that she suffered non-accidental, intentional trauma at the hands of one or both of her parents."

¶25 The court further found, by clear and convincing evidence, that E.D.'s abuse also created an unreasonable risk of harm to M.G. and S.G. The court reasoned that despite the compelling medical testimony, Father D. and Mother remained united and did not show a willingness to leave the other to protect the children. The court also stated that it had concerns about their protective capacities because Mother did not initially consent to the forensic examination and did not take E.D. to her first follow-up appointment. The court further agreed with Dietzman's testimony that the children would be at risk of imminent harm in the parent's care.

¶26 The court found that termination of their parental rights was in the children's best interests because the children were in an adoptive

placement and Father D. and Mother spent their time in counseling addressing their anger at DCS rather than how to parent E.D. and M.G. by helping them cope with being victims of child pornography. The court also found that Father D. and Mother had offered the children money not to report a violation of DCS's parenting plan. The court noted that while the children had initially complained about their current placement, they have not complained since and that Mother may have coached the children to make the complaints. The court therefore found that termination of their parental rights was in the children's best interests. Father G., Father D., and Mother timely appealed.

## DISCUSSION

**¶27**        Father G., Father D., and Mother argue that the juvenile court erred by terminating their parental rights. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). We will affirm an order terminating parental rights so long as reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009). To terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground in A.R.S. § 8–533 has been proven and must find by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002).

### 1. Termination of Father G.'s Parental Rights

**¶28**        Father G. argues that no reasonable evidence supports the juvenile court's finding that he abandoned M.G. and S.G. He contends that he paid child support, that Mother prevented him from seeing M.G. and S.G., and that he had been in regular contact with his children for months by the time of trial.

**¶29**        The juvenile court may terminate parental rights when a "parent has abandoned [his] child." A.R.S. § 8–533(B)(1). "Abandonment" means

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and

communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8–531(1). A parent's conduct, not a parent's subjective intent, determines abandonment. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 18 (2000). When traditional means of bonding with a child are unavailable, a parent must act persistently to establish or maintain the relationship and must vigorously assert his legal rights "at the first and every opportunity." *Id.* at 251 ¶ 25.

¶30 Reasonable evidence supports the termination of Father G.'s parental rights based on abandonment. After March 2015, Father G. did not see his children for more than three years. During that time, he did not send his children letters, gifts, or cards. He never made any attempts to contact Mother using the Family Wizard application, never asked to borrow money to pay for the application, and never contacted the police or the family court to report that Mother violated the parenting plan. Even when he moved to Arizona and had $1,200 a month in disposable income, he never made any attempt to assert his parental rights. And while Father G. did pay child support, he only did so after he was arrested for failing to pay and the court garnished the amount from his paychecks.

¶31 Relying on *Calvin B. v. Brittany B.*, 232 Ariz. 292 (App. 2013), Father G. argues that Mother impeded his ability to have a parent-child relationship with his children because she blocked him on social media, blocked or did not respond to his phone calls, and moved to Arizona without notifying him. In *Calvin B.*, the mother impeded the father's ability to see his son by reducing the number of visits between them, obtaining an order of protection against the father, and eventually prohibiting the father from seeing son altogether. *Id.* at 294–95 ¶¶ 7–8. The father attempted to exercise his parental rights by contacting the mother's parents, filing various pleadings in the family court, completing a required parenting course, and texting the mother multiple times. *Id.* at 294–95 ¶¶ 3, 5–6, 8. This Court found that the father "actively sought more involvement" with his son than the mother would allow. *Id.* at 297 ¶ 22.

¶32 Unlike the father in *Calvin B.*, however, Father G. did not vigorously assert his legal rights to maintain a relationship with his children. While Mother did block him on one social media account and did not answer his phone calls in March 2015, he knew where Mother went to church in New Mexico and never contacted her there. Additionally, the

family court in New Mexico ordered him to contact Mother through the Family Wizard application but he never did. Even if Father G. could not afford to buy the application initially, when he moved to Arizona in March 2017, he had $1,200 per month in disposable income and still did not buy the application. He never called the police to report Mother's violation of the parenting plan and he never petitioned the New Mexico family court to assert his parental rights or attempt to have the filing fees waived. Aside from calling Mother several times a week for two weeks in March 2015, Father G. did nothing to assert his legal rights for more than three years. Because Father G. did not actively seek more involvement in his children's lives after March 2015, *Calvin B.* is inapplicable.

¶33        Father G. also argues that after DCS petitioned to terminate his parental rights, he had "regular, substantive, meaningful, supervised contact with his children for months and months by the time of trial." The presumption of abandonment is not automatically rebutted, however, "merely by post-petition attempts to reestablish a parental relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 8 (1990). The juvenile court found that Father G.'s post-petition attempts to see the children did not "outweigh the totality of the evidence nor his lack of effort." And, as stated above, reasonable evidence supports the court's abandonment finding. Therefore, the juvenile court did not err by terminating Father G.'s parental rights.

## 2. Termination of Father D.'s and Mother's Parental Rights

¶34        Father D. and Mother argue that no reasonable evidence supports the juvenile court's finding that they abused E.D. Mother argues that no reasonable evidence supports the court's order because E.D. could have been accidently cut when Peshlakai or someone else changed her diaper. She contends that since a plausible alternative explanation exists, DCS did not meet its burden of proof.

¶35        The juvenile court may terminate parental rights when a parent "has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." A.R.S. § 8–533(B)(2).

¶36        Reasonable evidence supports the juvenile court's finding that Father D. and Mother abused or failed to protect E.D. from abuse. Between August 6, 2018, and August 7, 2018, E.D. was either at the daycare or in Father D. and Mother's exclusive care. Based on the daycare's

bathroom logs, E.D. was not injured or bleeding on August 6, 2018. Dr. McMahon and Dietzman testified that Peshlakai could not have injured E.D. at the daycare on August 7, 2018, because E.D.'s diaper contained blood clots. Dr. McMahon also testified that E.D.'s injury could not have been caused by a caregiver changing her diaper.

¶37 Therefore, reasonable evidence supports the court's finding that the only plausible explanation for her injury was that, Father D., Mother, or both abused E.D. or failed to protect her from the other's abuse on the night of August 6, 2018, or the early morning of August 7, 2018. Dietzman and Dr. McMahon testified that E.D. would have been in significant pain when the injury occurred and would have screamed in pain, thereby alerting the other parent to her injury. So, even if one parent did not cause the injury, he or she should have known that the other parent abused E.D. As a result, the non-abusive parent failed to protect E.D. from the other parent's abuse.

¶38 Father D. and Mother argue that no reasonable evidence supports the court's abuse finding because several discrepancies exist about the length, cause, and timing of E.D.'s injury. They contend that the emergency room doctor indicated that E.D.'s injury was one-half to one centimeter while Dietzman testified the injury was three centimeters. Mother also argues that Dr. McMahon, Dietzman, and Dr. Sinkhorn all testified differently about the cause of E.D.'s injury.

¶39 Their arguments, however, are merely a request for this Court to reweigh the evidence and set aside the juvenile court's credibility findings. Because we do not reweigh evidence and defer to the juvenile court's credibility findings, we need not consider their arguments. *See Jesus M.*, 203 Ariz. at 280, 282 ¶¶ 4, 12. Even so, Dietzman testified that the emergency room doctor did not examine E.D. under anesthesia and would not have seen that E.D.'s injury extended inside her vagina. And Dr. McMahon testified that the injury was caused by both blunt force and a sharp object, which is consistent with Dietzman's testimony that a sharp fingernail could have caused the injury.

¶40 Mother next argues that the juvenile court applied the wrong standard to Dr. Sinkhorn's testimony by asking him to phrase his answers using the reasonable degree of medical certainty standard. Because Mother did not object to the court's instruction, her argument is waived. *See Henderson v. Henderson*, 241 Ariz. 580, 586 ¶ 13 (App. 2017) (an argument raised for the first time on appeal is waived). Additionally, the court discounted Dr. Sinkhorn's testimony based, in part, on his lack of expertise

in the field of child sexual abuse. Nothing in the record indicates that the phrasing of Dr. Sinkhorn's answers contributed to the court's rejection of his testimony. Therefore, even if the court did err, the error was harmless.[2]

**¶41**         Father D. argues that the juvenile court improperly shifted the burden from DCS to him because it "seemed to have held the parents accountable for failing to present . . . a reasonable and plausible alternative to DCS's theory of the case." While the court found that "the parents have not provided any evidence to suggest what [Peshlakai's] motivation would be to hurt [E.D.]," the court correctly stated the burden of proof and determined that DCS had proved that E.D. "was not injured at the daycare" and that "one or both parents intentionally or willfully abused [E.D.]." The record does not support Father D.'s argument that the court improperly shifted the burden from DCS to him.

**¶42**         Mother argues that DCS failed to prove the existence of a constitutional nexus between the abuse of E.D. and the risk of abuse to M.G. and S.G. She contends that the court erroneously found clear and convincing evidence that both M.G. and S.G. were at a risk of harm, arguing that because M.G. and S.G. were older children, the type of injury E.D. suffered was unlikely to occur to them. "[A] juvenile court may terminate a parent's rights to non-abused children under § 8–533(B)(2) only if the extrapolation of unfitness—the risk of harm to such children—is proven by clear and convincing evidence." *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 229 ¶ 24 (2020).

**¶43**         However, reasonable evidence supports the juvenile court's findings that M.G. and S.G. were at a risk of harm if they remained in Mother's care. Mother's behavior both before and after E.D.'s injury demonstrated the risk of harm. Immediately after the injury, Mother allowed E.D. to be forensically examined only after asking "what would happen" if she didn't give her consent. Mother then failed to take E.D. to her first post-surgical appointment. Mother then refused to participate in any Department services aside from visitation. Although she independently sought personal counseling, she focused that therapy on her anger at DCS for removing her children, rather than on learning how to

---

[2]         Mother also argues that this Court should disregard Dr. McMahon's testimony that Mother said, "I'm going to jail" because Dr. McMahon's testimony was not credible. But we defer to the juvenile court's credibility determination, *see Jesus M.*, 203 Ariz. at 280, 282 ¶¶ 4, 12, and this issue is waived because Mother raised the argument for the first time in her reply brief, *see Romero v. Sw Ambulance*, 211 Ariz. 200, 204 ¶ 7 n.3 (App. 2005).

help E.D. cope with the trauma she suffered. Finally, Dietzman testified that the children would be at an imminent risk of harm if they remained in her care.

¶44        Mother also argues that she did not need to accept DCS's position of what happened to E.D. and that she could reasonably believe a different explanation of E.D.'s injury. As previously stated, reasonable evidence supports the juvenile court's finding that the only plausible explanation for E.D.'s injury was that Father D., Mother, or both abused E.D. or failed to protect her from the other's abuse. Therefore, the court did not err by finding that Father D. and Mother remained committed to each other and were unwilling to consider the compelling evidence of how E.D.'s injury occurred. *See Sandra R.*, 248 Ariz. at 231 ¶ 33 (affirming the juvenile court's termination order to non-abused children because, among other things, the parents "remained committed to one another to the exclusion of the children").[3]

### 3. Best Interests Findings

¶45        Father D. and Mother argue that the juvenile court abused its discretion by finding that terminating their parental rights was in E.D.'s, M.G.'s, and S.G.'s best interests. They contend that no reasonable evidence supports the court's findings, citing testimony of both DCS case aide, who did not observe any issues during their visits with the children, and Dr. Oakley, who opined that both Father D. and Mother had a secure attachment with the children and that separating the children from them could be harmful. They also argue that the case aide noticed some issues with the children's placement and acknowledged that the children complained about the placement.

¶46        Termination of parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 20 (App. 2014). In determining whether the child will benefit from termination, relevant factors to consider include whether the current

---

[3]        When making the *Sandra R.* constitutional nexus finding, the juvenile court took an extra step by including Father D. in the analysis. Because Father D. is the biological parent to only one child, the juvenile court did not need to make that finding and Father D. suffered no prejudice by the court doing so.

placement is meeting the child's needs, an adoption plan is in place, and if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016).

**¶47** Reasonable evidence supports the juvenile court's best interests findings that the children would benefit from the termination and would be harmed if the relationship continued. DCS's case manager testified that paternal grandmother, the children's current placement, was meeting the children's needs and that all three children were adoptable. She further testified that Father D. and Mother attempted to pay the children to withhold information from DCS and violated visitation guidelines by secretly communicating with the children in a notebook. Additionally, paternal grandmother testified that Father D. and Mother coached the children, telling them that paternal grandmother was "mean." Paternal grandmother also testified that she was willing to adopt all three children.

**¶48** Father D. and Mother both refused to participate in services and Mother focused her personal counseling on her anger at the DCS, rather than learning to help E.D. cope with the trauma she had suffered. And though Dr. Oakley testified that separating the children from Father D. and Mother could be harmful, she conceded that her opinion could change if Father D. or Mother had abused or failed to protect the children. As a result, reasonable evidence supports the juvenile court's finding that termination of Father D.'s and Mother's parental rights were in the children's best interests.[4]

## CONCLUSION

**¶49** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[4] Father G. does not challenge the juvenile court's best interests findings on appeal.